UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-23070-CIV-SCOLA

*In re* the complaint of Royal Caribbean
Cruises Ltd.
_____/

**ORDER GRANTING IN PART AND DENYING IN PART
ROYAL CARIBBEAN'S SUMMARY-JUDGMENT MOTION**

This case arises out of a collision between two jet skis during a jet-ski tour provided by Royal Caribbean Cruises Ltd. (Royal). Royal instituted this action for exoneration from or limitation of liability under 46 U.S.C. § 30505. In response, Claimant Linda Arnold filed a claim and a complaint for damages, alleging that Royal was liable for the injuries she suffered during the jet-ski collision. Royal moves for summary judgment, arguing in the alternative that Arnold waived her right to sue for damages by signing a liability waiver, that Royal should be exonerated from liability because there is no evidence of Royal's negligence or contributory fault, and that Royal's liability should be limited because Royal had no privity or knowledge of any negligence or unseaworthiness that caused the accident. For the reasons set forth below, Royal's Motion (DE (Docket Entry) 44) is granted in part and denied in part. Specifically, the Court holds that the liability waiver is unenforceable, that Royal is not exonerated from liability with respect to Arnold's claim that Royal failed to provide a competent operator of the jet ski that hit her, and that Royal's liability is not limited with respect to that claim.

**BACKGROUND**

The following facts are undisputed. Arnold and her boyfriend, Glynn Daniels, were passengers on a three-day cruise aboard the *Monarch of the Seas* beginning February 25, 2011. The cruise left from and returned to Port Canaveral, Florida, visiting Nassau, Bahamas and Coco Cay, Bahamas on its journey. Coco Cay is an island run and operated by Royal as its private, exclusive destination. (DE 51 at 4; DE 56 at 2.)

After arriving at Coco Cay, Arnold and Daniels decided to participate in a jet-ski tour offered by Royal. They signed up for the tour on the island and completed a liability waiver (Waiver). Before going on the tour, they were required to go through an orientation, which consists of an instructional video, a verbal orientation, and a demonstration on a mock-up jet ski.

They were instructed on various safety rules, such as being told not to pass other jet skis and to maintain a distance of 100 yards from the jet ski in front of them. The orientation was conducted by the tour guides, who are employees of Royal.

The tour itself operates as a follow-the-leader tour, with a guide in the front, guests spaced in a single-file line, and a guide in the rear. All participants were assigned a number, which designated their place in line in the tour. Arnold and Daniels were number six. The plan at the start of the tour was to have the rear guide, or "chase," space out the guests by letting them go only when the jet ski ahead of them was a sufficient distance away.

After Arnold and Daniels left on their jet ski, they began to catch up to jet ski five, which had slowed down. Daniels in turn slowed down the jet ski that he and Arnold were riding. Other jet skis behind them caught up. Then, Arnold and Daniels were struck by a jet ski operated by another participant (either jet ski 8 or 9). (DE 44-2 at 60; DE 44-5 at 75-76, 84.) Arnold suffered injuries as a result of the accident.

On August 25, 2011, Royal brought this action for exoneration from or limitation of liability. Arnold filed a claim and a Complaint, which she later amended, in response. Royal moves for summary judgment. The parties and Court agree that the Court has admiralty jurisdiction over the case.

## ANALYSIS

1. **Summary-judgment standard**

Under Rule 56 of the Federal Rules of Civil Procedure, "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" *Alabama v. North Carolina*, 130 S. Ct. 2295, 2308 (2010) (quoting Fed. R. Civ. P. 56(a)). Rule 56 requires a court to enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

"The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Rule 56 "requires the

nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks omitted); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1984) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.").

The Court must view the evidence in the light most favorable to the nonmoving party, and summary judgment is inappropriate where a genuine issue material fact remains. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. Northern Crossarm Co., Inc.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. A court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied. *Skop v. City of Atlanta, Georgia*, 485 F.3d 1130, 1140 (11th Cir. 2007).

**2.     Enforceability of the liability waiver**

Royal contends that Arnold waived her right to sue for damages by signing a waiver (Waiver) in which she agreed to release Royal and its employees from actions "arising from any accident [or] injury . . . in any way connected with [her] rental, participation, use, or operation of [the jet ski]." (DE 44-3 at 1 (capitalization removed).) But the Waiver is enforceable only if it does not fall within the ambit of 46 U.S.C. § 30509. Section 30509 provides as follows:

(a) Prohibition.–

(1) In general.–The owner, master, manager, or agent of a vessel transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign country, may not include in a regulation or contract a provision limiting–

(A) the liability of the owner, master, or agent for personal injury or death caused by the negligence or fault of the owner or the owner's employees or agents; . . .

. . .

(2) Voidness.--A provision described in paragraph (1) is void.

To determine if the statute covers the Waiver, the Court applies the rules of statutory construction. *Johnson v. Royal Caribbean Cruises, Ltd.*, 449 F. App'x 846, 848 (11th Cir. 2011). "The first rule in statutory construction is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute. If the statute's meaning is plain and unambiguous, there is no need for further inquiry." *Id.* (quoting *United States v. One 1990 Beechcraft*, 619 F.3d 1275, 1279 (11th Cir. 2010).

*Johnson* is instructive. Charlene Johnson was a passenger on a ship owned by Royal who participated in the "Flowrider—a simulated surfing and body boarding activity." *Id.* at 847. Before she was able to purchase a ticket for the Flowrider, she had to sign a similarly broad waiver releasing Royal from liability for negligence. *Compare id.* at 847-48 (setting forth the waiver language she signed) *with* DE 44-3 at 1 (setting forth the Waiver language in the present case). She was injured while using the Flowrider and sued Royal for negligence. *Id.* at 848. Royal moved for summary judgment, contending that the waiver barred her from recovering for her injuries. *Id.* The district court granted Royal's summary-judgment motion, reasoning in relevant part that even if maritime law applied, § 30509 did not, and the waiver was enforceable. *Id.*

The Eleventh Circuit reversed because it found that "the plain and unambiguous meaning of [§ 30509's] language" made it "clear that the statute most certainly applies." *Id.* at 849. Because the waiver contained a provision limiting Royal's liability for personal injury or death caused by the negligence of Royal or its employees, the waiver met the conditions of § 30509(a)(1)(A). *Id.* at 848. And the waiver met the conditions of § 30509(a)(1) because "Royal is also undoubtedly 'the owner . . . of a vessel transporting passengers between . . . a port in the United States and a port in a foreign country." *Id.* (quoting § 30509(a)(1)). The district court erred by ignoring the statute's plain language and instead focusing on the statute's underlying policy rationales. *Id.* at 849. Those policy rationales were nowhere in the statute: the "statute contains no exceptions regarding the type of activity—whether recreational, ultra hazardous, or otherwise—in which the passenger is partaking when the injury occurs nor where the particular provision is found—whether on the back of a ticket or in a separate, signed,

electronic document as here." *Id.* Because the waiver clearly fell within the statute's language, that was all that mattered. *Id*. at 848-49.

Applying similar reasoning, a district court in this district held that § 30509's "broad and unqualified" language prevented Royal from disclaiming liability for its own negligence even when the passenger was injured "during an off-shore excursion tour [a zip line] owned and operated by . . . an independent third-party company [Chukka]." *Smolnikar v. Royal Caribbean Cruises, Ltd.*, 787 F. Supp. 2d 1308, 1316 (S.D. Fla. 2011) (Jordan, J.). *Smolnikar* considered § 30509's impact on the enforceability of several waivers. *Id.* at 1310-1311, 1315-1317. "On multiple occasions before and during the cruise, Royal Caribbean provided Ms. Smolnikar with written disclaimers expressly indicating that the offshore excursion tours offered during the cruise were operated by independent contractors and that Royal Caribbean would not be liable for any injuries stemming from these excursions." *Id.* at 1310. This included a disclaimer provision in the passenger's cruise-ticket contract and on the back of the ticket for the excursion. *Id.* at 1310-11. In addition, the passenger had to sign another disclaimer provided by Chukka—the third-party company that owned and operated the zip-line tour—before the passenger could participate in the tour. *Id.* at 1311. That disclaimer, in relevant part, provided: "I hereby indemnify and hold harmless Royal Caribbean against any liability for personal loss or injury . . . whether or not arising from negligence or default of Chukka Blue Adventure Tours while on the Chukka Canopy Tour." (*Id.* (ellipses and brackets omitted).

Royal argued that these disclaimers absolved it from liability for the injuries allegedly sustained by the passenger during the zip-line tour. *Id.* at 1315. But even though the suit arose from injuries sustained off shore during an excursion tour operated by an independent third-party company, the claims—which "assert[ed] direct negligence on the part of Royal Caribbean, undisputably a common carrier"—fell "within the parameter of § 30509's prohibitions against disclaimers because the statute's language is broad and unqualified . . . There is no exception in the statute for claims based on events or omissions occurring in the midst of a voyage but at an offshore location or in the course of an offshore excursion." *Id.* at 1316. The plain language of § 30509 therefore "expressly forbids Royal Caribbean from limiting or disclaiming liability stemming from a passenger's allegations of direct negligence against it (regardless of whether the incident occurred offshore)." *Id.*

Royal's last stand was to argue that § 30509 did not apply to Chukka's disclaimer form because the statute applied only to passenger vessels, something Chukka was not. The district court rejected this argument because accepting it would allow a passenger vessel to "circumvent § 30509(a)(1)(A)'s broad prohibition by having its passengers execute a disclaimer form provided by a separate offshore entity, which absolves both the third-party entity and the passenger vessel owner." *Id*. at 1317. Accepting this argument would also undercut the principle that "passenger vessels have a duty to their passengers 'beyond their port,'" a principle upheld in a "negligence action against a cruise line based on an offshore incident." *Id.* (quoting *Carlisle v. Ulysses Line Ltd.*, 475 So.2d 248, 251 (Fla. 3d DCA 1985) (reversing a grant of summary judgment in favor of the cruise line on a negligence claim for injuries sustained while on shore because a cruise line's duty of care for its passengers "extends throughout the length of the voyage, and does not cease at each port of call, only to resume when the passenger re-embarks")).

In light of §30509's broad and unqualified language, which both *Johnson* and *Smolnikar* recognized, the Court holds that the Waiver in the present case falls within § 30509 and is therefore void. Royal is indisputably the owner of a vessel transporting passengers between a United States port and a foreign port—the *Monarch of the Seas* travelled from a Florida port to a Bahamas port. So § 30509(a)(1)'s conditions are satisfied, just as they were in *Johnson* and *Smolnikar*. And the Waiver in the present case, just like the waivers in *Johnson* and *Smolnikar*, clearly seeks to limit Royal's liability for injuries allegedly caused by its negligence. This satisfies § 30509(a)(1)(A)'s conditions. Since the Waiver falls within the statute's broad language, the provisions purporting to release Royal from liability are void under § 30509(a)(2).

Royal's arguments to the contrary fail to persuade. Contending that the statute applies only when a common carrier is performing actual responsibilities of a common carrier like transporting passengers from place to place, Royal asserts that providing recreational activities and services like the jet-ski tour are not common-carrier responsibilities. (DE 44 at 10-11.) But nothing in § 30509's language supports cabining the statute this way. Provided that there is an owner of "a vessel transporting passengers between ports," the owner "may not include in *a* regulation or contract a provision limiting [the owner's] liability . . . for personal injury or death caused by the negligence or fault of the owner." 46 U.S.C. § 30509(a)(1) (emphasis added). That language does not require that the contract containing the liability-limiting provision relates

to the actual responsibilities of a common carrier—indeed, the use of the indefinite article *a* implies that any owner's contract that contains a limiting-liability provision in favor of the owner would be covered (again, provided that the owner owns a vessel transporting passengers).[1]  Put another way, Royal's argument is premised on a purported policy rational behind § 30509— namely, "that common carriers should not be able to secure immunity from liability for their own negligence in providing *transportation and other essential functions* of common carriers," *Johnson v. Royal Caribbean Cruises, Ltd.*, 802 F. Supp. 2d 1316, 1320 (S.D. Fla. 2011)—rather than the plain meaning of the statute's language.  The Eleventh Circuit in *Johnson* rejected not only this precise analytical approach (focusing on policy rather than statutory language), but also this precise "purported policy rationale."  449 F. App'x at 849 (reversing *Johnson*, 802 F. Supp. 2d 1316, and the "purported policy rationale" it relied on in favor of § 30509's plain language).  Because *Chervy v. Peninsular and Oriental Steam Navigation Co., Ltd.*, 243 F. Supp. 654, 655 (S.D. Cal. 1964) similarly relies on the public policy behind the predecessor statute to § 30509 rather than the statute's plain language, the Court declines to follow *Chervy*.  *See Johnson*, 449 F. App'x at 849 (holding that courts should focus on the plain language of § 30509 rather than the "purported policy rationale" behind it).

Royal next claims that both *in re Complaint of Royal Caribbean Cruises, Ltd.*, 459 F. Supp. 2d 1275 (S.D. Fla. 2006) (Cooke, J.) and *in re Complaint of Royal Caribbean Cruises, Ltd.*, 403 F. Supp. 2d 1168 (S.D. Fla. 2005) (Huck, J.) support its position because those cases enforced substantially similar waivers, thereby absolving Royal from liability for injuries adults suffered during jet-ski accidents around Coco Cay, Bahamas.  Although both of these cases did enforce the waivers in this manner during the summary-judgment stage of the proceedings, neither case considered the impact of § 30509, or its predecessor, 46 App. U.S.C. § 183c.[2]  *See Royal Caribbean*, 459 F. Supp. 2d at 1278-79; *Royal Caribbean* 403 F. Supp. 2d at 1170-71.  That is not surprising because no party brought up either statute in their briefings.  *See* DE 91,

---

[1] The statute similarly does not require that the claimant allege that the injury was suffered on the passenger vessel or was caused by the owner's performing common-carrier responsibilities in order for the claim to fall within the statute's parameters.  All that is required with respect to the claim is that it asserts that the injury was "caused by the negligence or fault of the owner."  46 U.S.C. § 30509(a)(1)(A).

[2] 46 U.S.C. § 30509 became effective on October 6, 2006 and replaced 46 App. U.S.C. § 183c.  For purposes of this case, both statutes are materially identical.  The more recent of the two cases was issued on October 23, 2006, just a little over two weeks after § 30509 took effect.

94-95 in *Royal Caribbean*, 459 F. Supp. 2d 168, Case No. 04-20155-CIV; DE 47, 53, 56 in *Royal Caribbean*, 403 F. Supp. 2d 1168, Case No. 03-21868-CIV.  Since no one raised the relevant statutes and the Court did not discuss them, these cases fail to grapple with the issues raised by this case and are thus unpersuasive.

That neither of these cases had the opportunity to consider § 30509 or its predecessor also undercuts Royal's attempts to distinguish *Smolnikar*.  In *Smolnikar*, Royal relied on these two cases, contending that they supported the argument that § 30509 did not apply to Chukka's disclaimer form because Chukkah was not a passenger vessel subject to § 30509.  *Smolnikar* distinguished these two cases thus: "[i]n both of these cases, the negligence claims were brought against Royal Caribbean as the owner of the [jet ski], and not in its capacity as the owner of a passenger cruise ship subject to §30509(a)(1)(A).  For that reason, neither decision discussed, or even mentioned, the applicability of § 30509(a)(1)(A)."  *Smolnikar*, 787 F. Supp. 2d at 1317.  But the reason neither case even mentioned § 30509 was that no party raised it in their briefing, so the courts in those cases were not aware of the issue.  *Smolnikar* therefore ascribed a principle to these cases that wasn't there.  Since *Smolnikar*'s remarks about these cases were simply for the purpose of distinguishing them and were not necessary to the holding, the remarks are dicta that the Court declines to adopt.  The relevant teaching of *Smolnikar* is that § 30509 will invalidate waivers seeking to disclaim liability for an owner of a passenger vessel even when those disclaimers (1) are provided by a wholly separate offshore entity[3] that is manifestly not a passenger-vessel owner, (2) appear in the separate offshore entity's contracts, and (3) disclaim liability for injuries suffered entirely during offshore recreational activity that is owned and operated by the separate entity.  *Id.* at 1316-17.

Royal's next related contention—that the relevant vessel is the jet ski, which means that § 30509 does not apply because the jet ski does not transport passengers between ports—also

---

[3] "Royal Caribbean representatives . . . testified without contradiction that Chukka's Montego Bay zip line tour was not owned, operated, leased, managed, maintained, or controlled by Royal Caribbean; that Royal Caribbean is not involved in a joint venture or agency relationship with Chukkah; that Chukka's relationship with Royal Caribbean was that of an independent contractor; that Royal Caribbean did not have the authority to employ, hire, fire or control any of Chukka's agents or employees; that Royal Caribbean did not provide Chukka with any training as to how to operate or manage the tour, or supply them with the materials for use in its operations; and that Royal Caribbean did not share profits or losses with Chukka in any way." *Smolnikar*, 787 F. Supp. 2d at 1311 n.1.

fails to persuade. First, it would be incongruous to hold that § 30509 cannot reach a waiver for an excursion involving jet skis owned by an owner of a passenger vessel but that it can reach a waiver for a completely land-based excursion (for example, a zip-line tour) owned and operated by an entity independent from the owner of the passenger vessel. This incongruity is thrown into even sharper relief when one considers what result the logic of *Smolnikar* would dictate if the jet-ski tour had been run by an independent entity instead of by Royal, and that independent entity provided a waiver purporting to disclaim liability for both itself and Royal, a set of facts on all fours with *Smolnikar*. Under those circumstances, § 30509 would indisputably invalidate the waiver's provisions disclaiming Royal's liability for "direct negligence" claims such as the claims that Royal "itself was negligent in failing to warn of dangerous conditions on the [jet-ski] tour and that it negligently selected and/or retained [the jet-ski-tour owner and operator] as an independent contractor. *See id.* at 1316-1317 (holding that § 30509 voided the provisions disclaiming Royal's liability for the direct negligence claims of failure to warn and negligent selection or retention). How odd it would be if Royal could disclaim liability entirely when it provided the jet-ski tour itself, but could not disclaim liability entirely if an independent entity provided the jet-ski tour instead. Common sense dictates that Royal should be more exposed if it provides the tour, not less. Even more damning than the absurd result produced by Royal's argument, § 30509's plain language provides no support for the argument. As discussed previously, the present case's facts meet the two conditions required for § 30509 to govern a waiver—namely, that the owner owns a vessel transporting passengers between ports and that the contract at issue contains a provision limiting the owner's liability for injuries caused by the owner's negligence. *See* 46 U.S.C. § 30509. And nothing in the statute's language—which is plain, unambiguous, broad, and unqualified—contains an exception providing that if the owner owns two vessels, only one of which meets the transporting-passengers-between-ports condition, then the statute voids the liability-limiting provisions for that vessel only. *Cf. Smolnikar*, 787 F. Supp. 2d at 1316 ("There is no exception in the statute for claims based on events or omissions occurring in the midst of a voyage but at an offshore location or in the course of an offshore excursion.").

To be sure, one could concoct hypotheticals that produce odd results under the statute as written: for instance, imagine if in addition to owning cruise liners, Royal also owned a very small boat from which it ran fishing tours that took and returned tourists to the same port that no

cruise ships went near.  Under the statute's plain language, § 30509 would void a limiting-liability provision in the fishing-tour-ticket contract just because Royal also owned cruise liners, even though the two operations had nothing to do with each other.  But that problem of statutory drafting—evident only in an extremely unlikely hypothetical—is for the legislature, not this Court.  *Johnson*, 449 F. App'x at 848 ("If the statute's meaning is plain and unambiguous, there is no need for further inquiry.  Judges are to ascertain—neither to add nor to subtract, neither to delete nor to distort the words with which Congress has expressed its purpose." (internal citation and quotation marks omitted)); *cf. Keys Jet Ski, Inc. v. Kays*, 893 F.2d 1225, 1229 (holding that while applying the Limitation Act to pleasure vessels may be "inconsistent with the historical purposes of the Act," restricting the Act to only commercial vessels requires congressional action).

The Court must decide the present case on its actual—not hypothetical—facts.  And those facts diverge sharply from the hypothetical because they establish a relationship between the cruise vessel and the jet ski.  Cruise passengers can purchase tickets for the jet-ski tour on board the cruise ship. (DE 51 at 4; DE 56 at 2.)  And Arnold could not have arrived at Coco Cay—an island run and operated by Royal as its private, exclusive destination—to take the jet-ski tour as a tourist without being a passenger.  (*Id.*)  Coco Cay was a planned destination of the cruise, and Royal features Coco Cay as a "tropical paradise" replete with swimming and watersports activities, shopping, food, "white-sand beaches and spectacular surroundings" where "dreams of golden hours on a tranquil island . . . come true." (DE 43-1; DE 43-2 at 2.)  So like a "scheduled port-of-call," Coco Cay

> was an integral part of the on-going cruise or maritime activity in this case. Ports-of-call not only add to the enjoyment of a cruise but form an essential function of the cruise experience. In fact, on this particular cruise, [one] of the [three] nights w[as] spent in [Coco Cay]. Plainly, individuals choose cruise ship vacations because they want to visit unfamiliar places ashore. Cruises to Alaska, the New England States, Bermuda or the Caribbean offer fundamentally different experiences, not generally because of any material difference between ships, but often because of where the ships elect to stop. *See Isham v. Pacific Far East Line, Inc.*, 476 F.2d 835, 837 (9th Cir.1973) ("Where a passenger or cruise vessel puts into numerous ports in the course of a cruise, these stopovers are the sine qua non of the cruise."). When a passenger selects a particular cruise, ports-of-call or stopovers provide those passengers with the "cruise experience" for which they are paying. Simply put, the destinations or ports-of-call are frequently the main attraction.

*Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 901 (11th Cir. 2004). In sum, Coco Cay and the activities available there—including the jet-ski tour—were "integral" to the cruise in the present case. *Id.* And since Coco Cay was run and operated by Royal as its private, exclusive destination, Coco Cay and the activities there were even less removed from the cruise in the present case than the zip-line tour owned and operated by Chukka was from the cruise in *Smolnikar*. So since *Smolnikar* applied § 30509 to void the limiting-liability provision at issue there, it follows by even stronger force of logic that § 30509 applies to void the waiver in the present case.

The final cases cited by Royal, which held that § 30509's predecessor statute (46 App. U.S.C. § 183c) did not void limiting-liability provisions, do not apply to this case because they involve an entirely different circumstance: the owners in these cases own only vessels that do not transport passengers between ports. *Waggoner v. Nags Head Water Sports, Inc.*, 141 F.3d 1162, at *6 (4th Cir. 1998) (unpublished table opinion) (holding that § 183c did not apply to void the liability-limiting provision because the owning entity, which rented jet skis, "was not engaged in transporting passengers between ports of the United States or between any such port and a foreign port"); *Cook v. Crazy Boat of Key West, Inc.*, 949 So. 2d 1202, 1203 (Fla. 3d DCA 2007) (holding that § 183c did not apply to void the liability-limiting provision because the vessel owned "did not travel between ports of the United States but rather left from and returned to the same port"). But Royal, unlike the owners in *Waggoner* and *Cook*, indisputably does own a vessel satisfying the transporting-passengers-between-ports condition of the statute.

For all these reasons, § 30509 applies to the Waiver, thereby nullifying the limiting-liability provisions within it.

**3.    The merits of Royal's action for exoneration or limitation**

Because the Waiver is unenforceable, the Court must now reach the merits of Royal's contention that it is entitled to exoneration from or limitation of liability under 46 U.S.C. § 30505. With exceptions not relevant here, § 30505 provides, in relevant part, as follows:

> (a) In general.–. . . the liability of the owner of a vessel for any claim, debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending freight. . . .
>
> (b) Claims subject to limitation.–Unless otherwise excluded by law, claims, debts, and liabilities subject to limitation under subsection (a) are those arising from

> any . . . loss, damage, or injury by collision, . . . done, occasioned, or incurred, without the privity or knowledge of the owner.

Jet skis are vessels for purposes of the Limitation of Liability Act, 46 U.S.C. §§ 30501-30512 (Limitation Act). *Keys Jet Ski*, 893 F.2d at 1229-30.

Courts conduct a two-step inquiry to determine the effect of a vessel owner's petition for exoneration from or limitation of liability. *In re Complaint of Messina*, 574 F.3d 119, 126 (2d Cir. 2009). A court first determines whether the accident was caused by actionable conduct, "for if there was no fault or negligence for the shipowner to be privy to or have knowledge of within the meaning of the statute, there is no liability to be limited, and the owner would then be entitled to exoneration." *Id.* (brackets, internal citations, and internal quotation marks omitted); *accord American Dredging Co. v. Lambert*, 81 F.3d 127, 129 (11th Cir.1996) ("A shipowner is entitled to exoneration from all liability for a maritime collision only when it demonstrates that it is free from any contributory fault."); *in re Royal Caribbean Cruises, Ltd.*, 55 F. Supp. 2d 1367, 1369-70 (S.D. Fla. 1999) (Seitz, J.) ("If there is no evidence of Royal Caribbean's negligence or contributory fault, then Royal Caribbean is entitled to exoneration from all liability."). The claimant bears the burden of proving that the accident was caused by actionable conduct. *Messina*, 574 F.3d at 126-27. Provided that the claimant carries the burden, the owner then must prove that the "actionable conduct or condition was without his privity or knowledge." *Id*. at 127. Owners may limit their liability to the value of the vessel and pending freight if they had no privity or knowledge of the actionable conduct or condition. *See* 46 U.S.C. 30505(b); *Royal Caribbean*, 55 F. Supp. 2d at 1371.

Proceeding to the first step of the analysis—whether the accident was caused by negligence or a condition of unseaworthiness—Arnold contends that Royal's conduct is actionable in two ways: (1) Royal was negligent because its employee, Calvin Missick, had released too many jet skis at the beginning of the jet-ski tour without properly spacing them, and (2) Royal had rendered the jet ski unseaworthy by violating its duty to provide a competent crew. The Court considers each contention in turn.

Arnold's first contention sounds in negligence. Establishing negligence under either maritime or common law requires proving the same elements. *Crayton v. Oceania Cruises, Inc.*, 600 F. Supp. 2d 1271, 1275 (S.D. Fla. 2009) (Ungaro, J.). Those elements are: "(1) that defendant owed plaintiff a duty; (2) that defendant breached that duty; (3) that this breach was

the proximate cause of plaintiff's injury; and (4) that plaintiff suffered damages." *Isbell v. Carnival Corp.*, 462 F. Supp. 2d 1232, 1236 (S.D. Fla. 2006) (Moreno, J.). Because each element is essential to a negligence claim, Arnold cannot rely on the allegations of her complaint to make the showing necessary to defeat Royal's summary-judgment motion. *Id*. at 1236-37.

Arnold argues that there is evidence that Royal was negligent because although Royal instructs jet-ski-tour participants to keep a distance of 100 yards from other jet skiers, evidence shows that Missick violated this rule. (DE 51 at 13.) Missick acted as the "chase," the rear tour guide, and one of the chase's responsibilities is to release the next jet ski in line from the starting point once the jet ski immediately in front is approximately 100 yards away. (DE 44-5 at 35-38.) Arnold contends that because there is evidence that the collision occurred within 100 yards of the dock where the tour began, and because Arnold (riding the sixth jet ski) was struck by Inghram (riding the eighth or ninth jet ski), one can infer that Missick released the intervening jet skis too quickly. (DE 44-2 at 60, 74; DE 44-5 at 53, 75-76, 81, 84.)

But even if Missick did release those jet skis too quickly, and even if that amounts to breaching the duty of reasonable care,[4] Arnold must still show that that act proximately caused her injury. *Hercules Carriers, Inc. v. Claimant State of Florida*, 768 F.2d 1558, 1566 (11th Cir. 1985) ("[F]ault in the abstract is not sufficient. To produce liability, the acts of negligence or conditions of unseaworthiness must be a contributory and proximate cause of the accident.") This requires that Missick's breach "be a substantial factor in bringing about the harm." *Chavez v. Nobel Drilling Corp.*, 567 F.2d 287, 289 (5th Cir. 1978)). Federal courts exercising admiralty jurisdiction may be guided by "the extensive body of state law applying proximate causation requirements and from treatises and other scholarly sources." *Exxon Co. U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 839 (1996). Florida courts require evidence affording a reasonable basis for concluding that

> it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the harm. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.

---

[4] Just because Royal has a rule that jet skis be separated by 100 yards, it does not necessarily follow that a tour guide releasing jet skis when they are less than 100 yards apart amounts to a breach of the duty of reasonable care. That follows only if reasonable care requires that jet skis be separated by 100 yards.

*Gooding v. University Hospital Building, Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984 (quoting Prosser*,* Law of Torts § 41 (4th ed. 1971)). The standard for a directed verdict in Florida is the same as the summary-judgment standard. *Compare Anderson*, 477 U.S. at 251-52 (holding that the essence of the inquiry under the summary-judgment standard and the directed-verdict standard "is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law) *with Etheredge v. Walt Disney World Co.*, 999 So. 2d 669, 671 (Fla. 5th DCA 2008) (holding that a directed verdict is granted only if no reasonable jury could render a verdict for the nonmoving party, even when viewing the evidence and the inferences drawn from it in the light most favorable to that party). Arnold's entire argument on proximate cause for the released-too-soon negligence theory is the following: there is evidence that the accident occurred within 100 yards of the dock, that she was riding jet ski six, and that she was struck by jet ski eight or nine; one can infer from this evidence that Missick released jet skis seven through eight or nine too soon; and one can further infer that it is more likely than not that releasing the jet skis too soon was a substantial factor in her being hit. But Arnold does not argue why the last inference rises above mere possibility. That's not surprising because the inference is speculative: a more plausible explanation for why Arnold was hit is that Inghram piloted her jet ski negligently. (Incidentally, this explanation underlies Arnold's second argument for liability—namely, that Inghram was not competent to pilot the jet ski and that Royal knew or should have known of Inghram's incompetence before allowing her to pilot a jet ski.) Moreover, "inferring specific links in a chain of cause from the occurrence of a specific effect"—which is precisely what Arnold does when she uses the accident (the effect) to infer the last link in her causation chain (the last inference)—"is yet more dicey and logically impermissible than compounding inferences to deduce a particular effect from a series of probable causes." *Estate of Brennan v. Church of Scientology Flag Service Organization, Inc.*, 832 F. Supp. 2d 1370, 1374 (M.D. Fla. 2011). Because mere possibility based on speculation is not enough, the Court concludes that Arnold cannot establish proximate cause as a matter of law. Her released-too-soon negligence theory therefore fails.[5]

---

[5] In one sentence, Arnold argues that because Inghram's jet ski struck the stationary Arnold jet ski, a presumption of negligence arises. (DE 51 at 12-13.) It is unclear whether Arnold intended

Arnold's second theory of liability is that Inghram was not competent to pilot the jet ski and that Royal knew or should have known of Inghram's incompetence before allowing her to pilot a jet ski. (DE 51 at 11-13.) Although she casts this theory alternately as negligence (contending that Royal negligently entrusted the jet ski to Inghram) or a condition rendering the jet ski unseaworthy, the analysis under either label is the same "because the test of reasonableness is the primary inquiry under both categories." *Hercules Carriers*, 768 F.2d at 1564 (merging together in the opinion the district court's separate findings regarding negligence and unseaworthiness).

A shipowner has a nondelegable duty to use due and proper care to provide a competent crew, and failing to do so can render a vessel unseaworthy.[6] *Id.* at 1565-66; *Messina*, 574 F.3d at 127. Satisfying the due-and-proper care standard requires that the owner have an objectively reasonable basis for believing "in the competence of the person to whom he is entrusting the vessel." *Id.* This requires "evidence of competence that renders the belief objectively reasonable." *Id.* (quoting *in re Guglielmo*, 897 F.2d 58, 62 (2d Cir. 1990)). So being ignorant of a "reason to suspect incompetence is not enough." *Id*. (quoting *Guglielmo*, 897 F.2d at 62). "Whether the evidence available to a boat owner concerning a non-professional operator is sufficient to support a reasonable belief in the operator's competence is up to the trier of fact to determine in light of all the circumstances." *Guglielmo*, 897 F.2d at 62.

In *Messina*, the Second Circuit affirmed a district court's finding that Messina, a jet-ski owner, did not use due and proper care in allowing another person, Murray, to operate the jet ski, thereby rendering the vessel unseaworthy because the crew (Murray) was incompetent. 574 F.2d at 124-28. Murray was operating the jet ski while towing Messina on an inner tube attached to the jet ski with a 50 foot rope. *Id*. at 122. When Murray approached the shore to bring Messina ashore, Murray came in too fast, did not see the victim standing near the shoreline, and caused

---

this one-sentence argument to be a separate theory of negligence. In any event, the argument is meritless because the Arnold jet ski was not at anchor, made fast to the shore, or aground. *Tassinari v. Key West Water Tours, L.C.*, 2007 WL 1760923, at *2 (S.D. Fla. June 18, 2007) (Moore, J.) (holding that the presumption of negligence did not apply to a jet ski that was at stop in the water because the jet ski was not anchored, made fast to the shore, or aground).

[6] "Seaworthiness is a relative term depending upon its application to the type of vessel and the nature of the voyage. The general rule is that the vessel must be staunch, strong, well equipped for the intended voyage *and manned by a competent and skillful master of sound judgment and discretion*." *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1155 (2d Cir. 1978) (emphasis added).

the inner tube to strike the victim. *Id*. at 124. The district court found that Murray was not sufficiently competent to operate the jet ski while towing an inner tube and while attempting to guide the inner tube ashore. *Id.* This rendered the jet ski unseaworthy because the district court found as a matter of law that "a vessel is unseaworthy if it is being operated by an incompetent crew." *Id*. Because Messina did not have evidence that would justify his subjective belief that Murray was competent to operate the jet ski under the circumstances, the district court further found that Messina breached the due-and-proper care standard when he let Murray operate the jet ski. *Id.* at 125, 128. (Messina adduced only one piece of evidence justifying his belief in Murray's competence: "Messina asked Murray whether he had ever towed an inner tube and Murray replied that he had." *Id*. at 125.) The Second Circuit affirmed these findings, reasoning that the district court did not err in applying the "legal principles" and that the district court's factual findings were "amply supported by the evidence." *Id.* at 128.

*Messina* establishes that when an owner allows a person to operate the owner's jet ski, that person is deemed the crew, and if that person ends up being incompetent, then the owner must have used due and proper care in selecting that person to avoid being responsible for injuries resulting from that incompetence. These principles are directly relevant to Arnold's claim that Royal did not use due and proper care in allowing Inghram to operate the jet ski. And there is evidence to support this contention. Arnold testified in her deposition that during the orientation and instruction before the jet-ski tour started, Inghram was acting "discombobulated," "couldn't stay focused," was holding up the tour, and "couldn't remember whether she was going to be a passenger or rider, [or] her number." (DE 44-1 at 57, 64-65.) Though Arnold did not see Inghram drink or do drugs, Arnold thought "something was wrong" with Inghram. (*Id.* at 65-66.) Daniels testified similarly: Inghram was laughing and being silly; she did not take anything during the orientation and instruction seriously; she had to be told the number of the jet ski she would drive three times; the tour guide told her that she wasn't paying attention; and she held up the group by ten minutes. (DE 44-2 at 53-54, 63.) Although Daniels did not think Inghram was drunk, he "felt like . . . she probably had a couple of drinks . . . because of the way she was acting." (*Id.* at 54, 71.) When viewed in the light most favorable to Arnold, the nonmoving party, this evidence of Inghram's conduct before the tour started creates a genuine issue of material fact concerning whether Inghram was competent to operate a jet ski. A reasonable factfinder could conclude that a person is not competent to operate a jet ski when that

person is unable to stay focused, fails to remember basic information such as whether she would control a jet ski or be a passenger, and generally behaves in such a way that others think that there is something wrong with her or that she may have had a couple drinks. And if a factfinder were to reach that conclusion, then Royal would have breached its duty to provide a competent crew because the tour guides authorized Inghram to operate a jet ski despite observing behavior that would demonstrate her incompetence. (DE 44-2 at 63 (testifying that the tour guide had an opportunity to view and observe Inghram's behavior); DE 44-5 at 71-72 (testifying that there are "quite a few" Royal employees at the hut where the orientation is conducted and that these people also observe whether participants are fit to participate in the tour).)

Causation would be met in these circumstances as well. No one disputes that Inghram was negligent in hitting Arnold's jet ski. So if Inghram were incompetent, then allowing her to operate the jet ski would be a substantial factor in Arnold's injuries. This in turn would establish that the vessel was unseaworthy, because if an incompetent crew's acts cause the damage at issue, then the vessel is unseaworthy. *See Hercules Carriers*, 768 F.2d at 1577 ("The actual conduct of such an incompetent crew which is the cause of the damage may involve the navigation or management of the vessel; nonetheless if incompetence results in a navigational error which causes the collision, it is crew incompetence, and therefore the unseaworthiness of the vessel, which has caused the damage." (Ellipses and internal quotation marks omitted.)).

The final question the Court must consider is whether Royal is entitled to limit its liability, which depends on whether it had privity or knowledge of the unseaworthy condition of the jet ski.[7] The Eleventh Circuit has held that a shipowner is not entitled to limit its damages "if the vessel was unseaworthy due to an incompetent crew or faulty equipment." *Id.* at 1563. Expanding on this rule, the Eleventh Circuit then held that "[a] shipowner may not limit his liability under the limitation act if his ship is unseaworthy due to equipment which was defective at the start of the voyage." *Villers Seafood Co., Inc. v. Vest*, 813 F.2d 339, 343 (11th Cir. 1987).

Arnold argues that these holdings dictate that if the Court finds the jet ski unseaworthy due to Inghram being incompetent, then Royal may not limit its liability. The Court agrees. Royal protests that three later Eleventh Circuit cases—*Tug Allie-B, Inc. v. United States*, 273

---

[7] Again, since negligence and unseaworthiness are two different ways to label the same claim—namely that Royal breached its nondelegable duty to provide a competent crew—one could phrase the final question as whether Royal had privity or knowledge of the negligent entrustment of the jet ski to Inghram.

F.3d 936, 944 (11th Cir. 2001); *Suzuki of Orange Park, Inc. v. Shubert*, 86 F.3d 1060, 1062-63 (11th Cir. 1996); *Keys Jet Ski*, 893 F.2d at 1230—make clear that the rule is that once a claimant establishes negligence or unseaworthiness, the vessel owner may limit liability by demonstrating a lack of privity or knowledge of the negligence or unseaworthiness. (DE 56 at 11.) But two of these later cases cite to *Hercules Carriers* for the rule Royal advances. *Tug Allie-B*, 273 F.3d at 944; *Suzuki*, 86 F.3d at 1062-63. And *Hercules Carriers* is the origin of the rule that a shipowner may not limit liability if the ship is unseaworthy due to an incompetent crew. *Hercules Carriers*, 768 F.2d at 1563. The third case Royal relies on—*Keys Jet Ski*, 893 F.2d at 1230—cites to two cases for the rule (*Farrell Lines Inc. v. Jones*, 530 F.2d 7 (5th Cir. 1976) and *Whiteaker v. Beavin*, 808 F.2d 762 (11th Cir. 1987)). But *Hercules Carriers* itself cites to *Farrell* for the limitation rules, and *Whiteaker* cites to *Hercules Carriers* for the rule Royal advances. *See Hercules Carriers*, 768 F.2d at 1563; *Whiteaker*, 808 F.2d at 764. In other words, all three cases Royal cites as cutting against the rule of *Hercules Carriers* themselves rely on *Hercules Carriers* for the rules regarding limiting liability.

  *Hercules Carriers* put forward two rules: the general rule that Royal advances, and the more specific rule urged by Arnold that applies when a ship is unseaworthy due to an incompetent crew or faulty equipment. *Hercules Carriers*, 768 F.2d at 1563-64. The specific rule should govern when the specific facts that rule depends on exist, as in the present case. *Cf. United States v. Robinson*, 583 F.3d 1292, (11th Cir. 2009) ("Where two statutes are related to the same subject and embrace the same matter, a specific or particular provision is controlling over a general provision.") Moreover, *Villers Seafood* provides an even more precise gloss on the specific rule of *Hercules Carriers*: namely, that the specific rule applies when the condition of unseaworthiness—faulty equipment in that case—exists at the start of the voyage. *Villers Seafood*, 813 F.2d at 343. This gloss further harmonizes the general and specific rules of *Hercules Carriers*. If a factfinder were to conclude that Inghram was incompetent, that finding would be based on evidence from before she even got on a jet ski. So the related finding of unseaworthiness would also have existed before the start of the voyage. Under these circumstances, the Court will apply the specific rule of *Hercules Carriers*, which prevents Royal from limiting its liability. This ends the analysis and also obviates the need to consider Arnold's pending motion to increase the security of the limitation fund (DE 43).

## CONCLUSION

For the reasons set forth above, the Court **GRANTS in part and DENIES in part** Royal's Motion for Summary Judgment (DE 44).  Because 46 U.S.C. § 30509 applies to the Waiver in the present case, the Court **DENIES** the portion of the Motion seeking to enforce the Waiver.  The Court **GRANTS** the Motion with respect to Arnold's argument that Royal was negligent because Missick had released too many jet skis at the beginning of the jet-ski tour without properly spacing them.  Royal is exonerated from liability under this negligence theory. But the Court **DENIES** the Motion with respect to Arnold's argument that Royal had rendered the jet ski unseaworthy by violating its duty to provide a competent crew.  With respect to this theory of liability, Royal is not entitled to either exoneration from or limitation of liability. Because Royal is not entitled to limit its liability with respect to this claim, and because only this claim remains valid at this stage, Arnold's Motion to Increase the Security of the Limitation Fund (DE 43) is **DENIED as moot**.  The case will proceed as normal on this last theory of liability.

**DONE and ORDERED** in chambers, at Miami, Florida, on February 4, 2013.

_____
**ROBERT N. SCOLA, JR.**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Designated Magistrate Judge
Counsel of record